**R. SHANE JOHNSON (14217)**
shane@utahdefense.com
75 EAST 400 SOUTH, SUITE 201
SALT LAKE CITY, UTAH 84111-5124
(801) 364-2222 PHONE
*Attorney for Plaintiff*

---

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

---

| | |
|---|---|
| PATRICIA MCNALLY, an individual, <br><br> *Plaintiff*, <br><br> -*v*- <br><br> BLAKE D. FENN, CHAD LARSEN, TANNER GROW, and SCOTT RICH, individually and in their official capacities as Orem City employees; RUSS BILLINGS, individually and in his official capacity as a Provo City employee; SHAUN BUFTON, DENNIS HARRIS, PHIL CRAWFORD, and DOUG HOWELL, individually and in their official capacities as Utah County employees; JOHN DOE 1, in his individual and official capacity as a Salt Lake City employee; PROVO CITY, UTAH COUNTY, OREM CITY, SALT LAKE CITY, and the UTAH COUNTY MAJOR CRIMES TASK FORCE, governmental entities; and JOHN DOES 2-20, whose identities are currently unknown, <br><br> *Defendants*. | **FIRST AMENDED COMPLAINT** <br><br><br> Civil № 2:17-cv-1021-PMW <br><br> The Honorable Judge Dale Kimball |

Plaintiff, by and through her undersigned counsel of record, hereby complains against

Defendants, and asserts the following allegations in their totality and in the alternative:

**PRELIMINARY STATEMENT**

The following allegations are based upon the undersigned's understanding of information

presently available. This is a civil rights action in which Plaintiff Patricia McNally seeks relief

for Defendants' violations of her rights as guaranteed by the United States Constitution, specifically, the Fourth and Fourteenth Amendments, which are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, § 1985 and § 1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Section 14, to the extent applicable under the facts.

On the evening of March 21, 2017, McNally was lying in bed, paying bills over the phone, and watching television when members of the Utah County Major Crimes Task Force burst through the front door of her home, arrested McNally at gunpoint, detained her for the next hour, and searched her home. McNally had nothing to do with the target of the Task Force's search warrant and lived in an altogether different residence.

Lehi Police Detective Jeffrey Allan Smith omitted from his application for a search warrant numerous clear indications that McNally's home was a separate residence rather than the simple "outbuilding" Smith described. Upon approach, and certainly upon entry, all Defendants who participated in the forced entry, arrest, and search of McNally's home ignored a host of telltale signs it was a separate residence. Rather than retreat from the search and release McNally, as the Fourth Amendment requires, the Defendants handcuffed McNally, interrogated her, threatened to jail her, searched her home, and insisted it did not matter that McNally lived in a residence separate from the suspect referenced in the warrant.

## JURY TRIAL DEMAND

McNally demands a trial by jury on each and every claim pleaded herein.

## PARTIES

1. Plaintiff Patricia McNally ("McNally") is a citizen of the United States and a resident of Salt Lake County, State of Utah.

2

2.   Defendants Provo City, Utah County, Orem City, Salt Lake City, and the Utah County Major Crimes Task Force are political subdivisions of the State of Utah.

3.   At all relevant times, Defendant Russ Billings ("Billings") was employed as a police officer for the Provo Police Department, and he was detailed to the Utah County Major Crimes Task Force. At all times alleged in this Complaint, Billings was acting in the course and scope of his employment, and under the color of law. McNally is suing Billings in his individual and official capacities.

4.   At all relevant times, Defendants Shaun Bufton ("Bufton"), Dennis Harris ("Harris"), Phil Crawford ("Crawford"), and Doug Howell ("Howell") were employed as deputy sheriffs for the Utah County Sheriff's Office, and were detailed to the Utah County Major Crimes Task Force. At all times alleged in this Complaint, Bufton, Harris, Crawford, and Howell were acting in the course and scope of their employment, and under the color of law. McNally is suing Bufton, Harris, Crawford, and Howell in their individual and official capacities.

5.   At all relevant times, Defendant Blake D. Fenn ("Fenn"), Chad Larsen ("Larsen"), Tanner Grow ("Grow"), and Scott Rich ("Rich") were employed as police officers for the Orem City Police Department, and detailed to the Utah County Major Crimes Task Force. At all times alleged in this Complaint, Fenn, Larsen, Grow, and Rich were acting in the course and scope of their employment, and under the color of law. McNally is suing Fenn, Larsen, Grow, and Rich in their individual and official capacities.

6.   At all relevant times, Defendants John Does 1-20 were employed by Salt Lake City ("John Doe No. 1"), Provo City, Utah County, Orem City, the Utah County Major Crimes Task Force, or another political subdivision of the State of Utah. At all times relevant to this Complaint, John Does 1-20 were acting within the course and scope of their employment with

3

these government agencies, and under the color of law. McNally is suing these Defendants in their individual and official capacities.

## JURISDICTION AND VENUE

7.    This action arises under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1983 and 1988. Accordingly, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.    The claims made in this Complaint occurred and arose in Salt Lake County, State of Utah. Accordingly, venue is proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**Affidavit for Search Warrant**

9.    Lehi Police Detective Jeffrey Allan Smith, who was then detailed to the Utah County Major Crimes Task Force ("Task Force"), applied for and received Search Warrant ("Search Warrant") No. 1560311 on March 21, 2017.

10.    Smith's Affidavit for Search Warrant (the "Affidavit") stated that police used a confidential informant to purchase drugs on two occasions in the prior 60 days from an "unknown Hispanic male" believed to reside in a residence located at 137 N. 900 West, Salt Lake City.

11.    The Affidavit and Search Warrant did not identify the suspect.

12.    The Affidavit and Search Warrant identified no other person residing at 137 N. 900 West, Salt Lake City, as being involved in the sole suspect's drug activity.

13.    The Affidavit described no drug transaction occurring at 137 N. 900 West, Salt Lake City.

4

14. The Affidavit stated the suspect drove a 2006 silver Toyota Corolla bearing Utah license plate W36 1NU.

15. The Affidavit did not identify the registered owner of the vehicle the suspect was observed driving, nor did it indicate that any such inquiry was conducted.

16. The Affidavit described no other vehicles associated with the property at 137 N. 900 West, Salt Lake City.

17. The Affidavit stated that the suspect travelled away from the residence to consummate drug transactions.

18. The Affidavit nonetheless requested, and the magistrate granted, permission to search all persons found at, or arriving to, the residence, based on Smith's "training and experience" that "[f]ailure to search the persons at, or arriving to, this residence for the presence of controlled substances and related paraphernalia will result in the loss of valuable evidence."

19. As to McNally's home for the then past seven years, the Affidavit stated simply: "Also directly behind the home is a white brick outbuilding."

20. Merriam-Webster defines an outbuilding as "a building (such as a stable or a woodshed) separate from but accessory to a main house."

21. McNally's home is a garage converted more than a decade ago into a studio apartment at 137 N. 900 West, #B, Salt Lake City, Utah.

22. The nature of McNally's home as a separate residence was apparent to Defendants at least upon entry, with Smith writing in his report of the search warrant service: "Patricia McNally was living in an outbuilding made into an *apartment* on the west side of the home." (Emphasis added.)

23. The Affidavit omitted all of the following:

    a. The suspect's street-facing residence had two mailboxes next to the front door where officers had observed the suspect coming and going.

b.  The mailboxes were visible from the street, and were visible from the publicly-available Google Maps imagery of the street-facing residence.

c.  One of the mailboxes on the street-facing residence was McNally's.

d.  McNally's home had two windows on each of four sides.

e.  McNally frequently parked her own vehicle immediately adjacent to the entry of her home, and the vehicle was shown parked there in Google Maps imagery available at the time.

f.  McNally's home had a satellite dish on the roof, which was visible in Google Maps imagery available at the time.

g.  McNally's home had a separate electric meter, with a separate power line wrapping around the home visible in Google Maps imagery available at the time.

h.  McNally's home and the street-facing residence each have three separate municipal waste cans for trash, recycling, and compost, respectively, with cans located next to McNally's home visible in Google Maps imagery available at the time.

i.  McNally's home was physically separate from the suspect's residence with no interior link between them.

j.  McNally's home had a solid green entry door with a peephole on the north side, a deadbolt lock, a welcome mat, and a porch light.

k.  Defendants never observed the target of their investigation associated with McNally or her home.

l.  McNally's home was located on property owned by Miracle Rock International Ministries, which also owns the real property located on parcels on either side of 137 N. 900 West.

6

       m.  The United States Post Office lists multiple mailing addresses for the target address, including McNally's address as 137 N. 900 West, *#B*.

**No-Knock Forcible Entry, Arrest, and Search**

24.   All Defendants knew or should have known that McNally was not suspected of criminal activity.

25.   All Defendants knew or should have known that the "outbuilding" described in the warrant was a separate residence from that of the suspect described in the warrant.

26.   All Defendants who approached McNally's home knew or should have known that it was a separate residence from that of the suspect described in the warrant.

27.   All Defendants who entered or observed the entry of McNally's home knew or should have known that it was a separate residence from that of the suspect described in the warrant.

28.   Upon information and belief, Defendants Billings, Bufton, Crawford, Howell, and Rich had the opportunity to intervene in the unconstitutional search of McNally's home, and seizure of her person, yet failed to do so.

29.   Upon information and belief, Defendants Billings, Bufton, Crawford, Howell, and Rich were present while a search warrant for a single unnamed suspect was executed on two separate structures, indicating at least a risk that McNally's residence was erroneously included within the scope of the Search Warrant.

30.   Defendant Rich entered McNally's home and took photographs long after it was clear that McNally lived in a separate residence unrelated to the target of the warrant.

31.   The exterior features of McNally's home alleged in Paragraph 23 of this Complaint were apparent to, or should have been apparent to, those Defendants who approached or observed McNally's home prior to forcing entry, including Defendants Fenn, Larsen, and Harris.

32.   After bursting through McNally's front door, all of the trappings of a residence equipped for independent living were clearly apparent.

7

33.    The interior of McNally's studio apartment included at least the following: a wardrobe, air conditioner, garment rack, television stand and television, full-size bed with Ms. McNally laying in it, nightstand, lamp, books, bookshelf, kitchen table, chair, laptop computers, refrigerator, stove, sinks, bathroom, dresser, vacuum, and water heater.

34.    McNally was lying in bed, in her night clothes, dentures removed, paying bills by telephone, and watching television when Defendants Fenn and Larsen and others nonetheless burst into what was clearly a separate residence not described as a separate residence in the warrant.

35.    Upon information and belief, Defendants Fenn and Larsen and others pointed military-style weapons at McNally's head.

36.    Upon information and belief, Defendants Fenn and Larsen ordered McNally out of bed at gunpoint, or they were present, along with Defendant Harris, when McNally was ordered out of bed at gunpoint.

37.    Upon information and belief, Defendants Fenn and Larsen forcibly handcuffed McNally, or they, along with Defendant Harris, were present when McNally was forcibly handcuffed.

38.    Upon information and belief, Defendants Fenn and Larsen accused McNally of possessing illegal drugs, or they, along with Defendant Harris, were present when others accused McNally of possessing illegal drugs.

39.    Upon information and belief, Defendants Fenn and Larsen ordered McNally to tell them where the drugs were, or they, along with Defendant Harris, were present when others ordered McNally to disclose the location of illegal drugs in her residence.

40.    Upon information and belief, Defendants Fenn and Larsen threatened to take McNally to jail if she did not tell them where to find the drugs, or they, along with Defendant Harris, were

8

present when others threatened to take McNally to jail if she did not disclose where to find drugs in her residence.

41.    Upon information and belief, Defendants Fenn and Larsen ordered McNally out of her home, or they, along with Defendant Harris, were present when others ordered McNally out of her home.

42.    Upon information and belief, Defendants Fenn and Larsen searched McNally's home, rifling through her personal belongings for approximately 20 minutes, but turned up no contraband, or they, along with Defendant Harris, were present when others searched McNally's home for approximately 20 minutes and turned up no contraband.

43.    Handcuffed, McNally's hair was stuck in her mouth, and she had difficulty answering officers' questions without her dentures.

44.    Upon information and belief, Defendants Fenn and Larsen escorted McNally back into her home, and took off her handcuffs, explaining that she did not appear to be a threat, or they, along with Defendant Harris, were present when others escorted McNally back into her home, took off her handcuffs, and explained that she did not appear to be a threat

45.    Upon information and belief, Defendants Fenn and Larsen forced McNally to sit in a chair in her home, remained in her home, and continued to detain her for approximately another 40 minutes, or they, along with Defendant Harris, were present while others forced McNally to sit in a chair in her home, remained in her home, and continued to detain her for approximately another 40 minutes.

46.    No Defendant apologized to McNally or acknowledged so much as that a mistake had been made.

47.    Upon information and belief, Defendants Fenn and Larsen insisted to McNally that the warrant authorized a search of the entire property, regardless of whether McNally lived in a residence separate and apart from Defendants' suspect, or they, along with Defendant Harris,

9

were present when others insisted to McNally that the warrant authorized a search of the entire property, regardless of whether McNally lived in a residence separate and apart from Defendants' suspect.

48. An officer employed by the Salt Lake City Police Department offered to help McNally secure the entrance to her residence; no other Defendant offered McNally any such help.

49. The unidentified Salt Lake City Police officer nonetheless entered McNally's home during execution of the search warrant while others handcuffed, detained, and searched McNally and searched her home.

50. Upon information and belief, Defendants were not trained to retreat from the search of a residence and the detention of its occupants upon learning of a risk that it was a separate residence erroneously included within the scope of a search warrant.

51. Defendant Fenn led the forcible breach of McNally's home, and thereby knew or should have known that she was not the suspect identified in the warrant, and thereby knew or should have known that McNally resided in a residence separate from that identified as the residence of the suspect in the warrant.

52. Defendant Larsen participated in the forcible breach of McNally's home, and thereby knew or should have known that she was not the suspect identified in the warrant, and thereby knew or should have known that McNally resided in a residence separate from that identified as the residence of the suspect in the warrant.

53. Defendant Harris observed the forcible breach of McNally's home, and thereby knew or should have known that she was not the suspect identified in the warrant, and thereby knew or should have known that McNally resided in a residence separate from that identified as the residence of the suspect in the warrant.

54. Defendant Grow observed the detention and search of McNally's home, and thereby knew or should have known that she was not the suspect identified in the warrant, and thereby

knew or should have known that McNally resided in a residence separate from that identified as the residence of the suspect in the warrant.

55.   Upon information and belief, other Defendants observed or otherwise participated in the forcible breach, detention, and search of McNally's residence, and thereby knew or should have known that she was not the suspect identified in the warrant, and thereby knew or should have known that McNally resided in a residence separate from that identified as the residence of the suspect in the warrant

## McNally's Injuries

56.   When Defendants forced entry into McNally's home and pointed military-style weapons at her head, McNally believed she was going to die.

57.   While Defendants searched McNally's home, they forced her to stand outside in her pajamas, cold, toothless, and handcuffed, causing her to feel humiliated, violated, powerless, and terrified.

58.   When Defendants threatened to jail McNally, she instantly felt devastated and mortified by the prospect of being jailed alongside, and disappointing, the prisoners whom she has ministered to for the past several years through her church.

59.   As a result of the Defendants' conduct:

    a.   McNally has been diagnosed with Posttraumatic Stress Disorder.

    b.   McNally has suffered recurrent, involuntary and intrusive memories of the raid, including traumatic night terrors and flashbacks.

    c.   McNally has suffered fear, horror, anger, and alienation from others.

    d.   McNally has lost time at work, and she has withdrawn from friends and family.

    e.   McNally has become obsessively hypervigilant about her surroundings, including avoiding encounters with police, who now terrify her.

11

f.  McNally has exaggerated startle responses, problems with concentration, and difficulty sleeping.

g.  McNally's symptoms have impaired her socially, occupationally, and within her community.

60.  Shortly after the raid, and as a result of Defendants' conduct, McNally has suffered several outbreaks of shingles which, upon information and belief, were brought on by the extreme stress and trauma caused by the raid.

61.  Prior to the raid, McNally had never experienced a shingles outbreak. McNally has suffered excruciating symptoms from the shingles outbreaks, including headaches, flu-like symptoms, sensitivity to light, rashes on her body which develop into painful blisters, itching, and extreme skin and nerve pain.

## FIRST CAUSE OF ACTION
### UNCONSTITUTIONAL SEARCH & SEIZURE
(Under 42 U.S.C. § 1983 in violation of the Fourth Amendment, against Blake Fenn, Chad Larsen, Dennis Harris, Tanner Grow, Salt Lake City Police Department John Doe No. 1, and all Defendants who entered or searched McNally's home, seized McNally, or failed to intervene to stop the search and seizure)

62.  McNally incorporates by reference and restates all preceding allegations.

63.  The warrant was fatally and facially overbroad by authorizing the search of multiple residences without distinguishing between the residences, and where Defendants lacked probable cause to believe illegal activity was occurring in each residence, or that their suspect had dominion and control over McNally's residence.

64.  The warrant was also fatally and facially overbroad in that it authorized the search of all persons found at, or arriving to, 137 N. 900 West, when the Affidavit and Search Warrant articulated no particularized basis to believe the suspect was in league with others on the

property, let alone with McNally. In this respect, the Search Warrant was so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable.

65.    All Defendants who entered McNally's home, searched it, or seized her, were required to discontinue the search and seizure immediately upon being put on notice of the *risk* that they might be in a separate residence erroneously included within the scope of the warrant, yet they failed to retreat, and failed to intervene to stop the unconstitutional search and seizure.

66.    All Defendants who entered McNally's home, searched it, or seized her knew or should have known of the risk that it was a separate residence upon approaching the residence, and then again upon entering it.

67.    All Defendants who entered McNally's home, searched it, or seized her, or failed to intervene, knew or should have known that probable cause did not exist to search and detain all persons found at or arriving to 137 N. 900 West.

68.    The Defendants ignored numerous obvious indications of a separate residence upon approaching McNally's home, among them: separate structures, separate power, separate satellite dish, separate municipal waste cans, a vehicle unassociated with the suspect parked next to the entrance, a worn path leading to the entrance, a residential door with deadbolt lock, peephole, porch light, and a welcome mat.

69.    The Defendants ignored incontrovertible indications of a separate residence upon entering McNally's home—a middle-age white woman lying in bed watching television as compared to the Spanish-speaking Hispanic male suspect who resided in the main house, a wardrobe, air conditioner, garment rack, television stand and television, full-size bed, nightstand, lamp, books, bookshelf, kitchen table, chair, laptop computers, refrigerator, stove, sinks, bathroom, dresser, vacuum, and water heater.

13

70.    These Defendants detained McNally and searched her home without probable cause, failed to retreat from the search and seizure as required by the Fourth Amendment and are therefore liable to McNally for all injuries and damages sustained as a result of their initial entry, failure to retreat from the search and seizure, and failure to intervene to terminate the unconstitutional search and seizure.

## SECOND CAUSE OF ACTION
### UNCONSTITUTIONAL SEARCH & SEIZURE
(Under Article I, Section 14 of the Utah Constitution, against Blake Fenn, Chad Larsen, Dennis Harris, Tanner Grow, Salt Lake City Police Department John Doe No. 1, and all Defendants who entered or searched McNally's home, seized McNally, or failed to intervene to stop the search and seizure)

71.    McNally incorporates by reference and restates all preceding allegations.

72.    McNally suffered flagrant violations of her right to be free from unreasonable search and seizure under Article I, Section 14 of the Utah Constitution, existing remedies under Utah law do not redress these injuries, and equitable relief is wholly inadequate to protect McNally's rights and redress her injuries to this end.

73.    The Utah Governmental Immunity Act immunizes governmental entities and employees from any suit for injury resulting from the exercise of a governmental function, including violations of civil rights. *See* Utah Code §§ 63G-7-201(1), (4).

74.    Equitable relief is wholly inadequate to protect McNally's rights and redress her injuries, inasmuch as existing state laws provide no penalty for their violation, failed to deter Defendants' unconstitutional conduct, and explicitly prohibit redress absent a finding of willful misconduct.

75.    The Utah Constitution's search and seizure provision is at least as protective, if not more protective, of the right to be free from unreasonable searches and seizures than its federal Fourth Amendment counterpart.

14

76.   Here, Defendants lacked any reason to believe McNally or her home were associated with the criminal activity involving the unnamed suspect.

77.   Defendants nonetheless forcibly entered McNally's home, detained her at gunpoint, handcuffed her, accused her of criminal conduct, threatened to jail her, and searched her home with no quantum of suspicion to believe McNally was involved in criminal activity, or failed to intervene to prevent any of these violations.

78.   Defendants' conduct, while acting under color of law, directly caused the deprivation of McNally's rights to be free from unreasonable search and seizure under the Utah Constitution, and all injuries and damages resulting therefrom.

## THIRD CAUSE OF ACTION
### MUNICIPAL LIABILITY
(Under 42 U.S.C. § 1983, Failure to Train in Violation of Fourth Amendment
Against Utah County, Orem City, Salt Lake City, Provo City and Utah County Major Crimes
Task Force)

79.   McNally incorporates by reference and restates all preceding allegations.

80.   Utah County, Orem City, Salt Lake City, Provo City and Utah County Major Crimes Task Force (the "Governmental Entities") bear liability for the unconstitutional conduct of their employees.

81.   Upon information and belief, the individual Defendants' lack of training, or deficient training, was directly and causally linked to the unconstitutional search of McNally's home and seizure of McNally.

82.   Upon information and belief, policymakers from the Governmental Entities' agencies were deliberately indifferent to whether their officers should retreat from execution of an overbroad warrant encompassing the search of multiple residences without a finding of probable cause as to each.

83.   Upon information and belief, policymakers from the Governmental Entities' agencies knew to a moral certainty that their police officers would be required to serve residential search warrants, and that the separation of individual residences is often not readily apparent to police when applying for and initially executing search warrants.

84.   Upon information and belief, the Governmental Entities' failed to train their officers to retreat from the search of a residence and seizure of its occupants upon discovering the risk that a warrant erroneously authorized the search of multiple residences, without a finding of probable cause as to each.

85.   Accordingly, the Governmental Entities' bear liability for the search and seizure violations committed by the individual Defendants it employed, inasmuch as the Municipal Defendants' failure to train its employees was directly and closely related to the Fourth Amendment violations and resulting injuries suffered by McNally.

86.    The Governmental Entities' failure to train the individual Defendants, as employees of the Governmental Entities, directly caused the deprivation of McNally's rights to be free from unreasonable search and seizure under the United States and Utah Constitutions, and all injuries and damages resulting therefrom

## **PRAYER FOR RELIEF**

WHEREFORE, McNally prays that this Court enter judgment against Defendants as follows:

1.   A declaration that Defendants' acts and practices violated Plaintiffs' rights under the Utah and United States constitutions;

2.   A permanent injunction against Defendants restraining them from committing such unconstitutional acts going forward, as well as affirmative relief directing Defendants to take such action as is necessary to eliminate similar violations going forward;

3.   Compensatory, special, and speculative damages in an amount to be determined at trial;

4.   Punitive damages on all claims allowed by law, in an amount to be determined at trial;

5.   Reasonable attorney fees and the costs of litigation; and

6.   All other relief this Court deems just and equitable.

DATED this 9th day of May, 2018.


/s/ R. Shane Johnson

R. Shane Johnson
*Attorney for Plaintiff*


# CERTIFICATE *of* SERVICE

On the 9th day of May, 2018, a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** was served by the method indicated below, and addressed to the following:

David L. Church                          ☐ Hand Delivery
5995 S. Redwood Road                      ☐ U.S. Mail
Salt Lake City, UT 84123                  ☐ Overnight Mail
801.261.3407                              ☐ Facsimile
*Attorney for Utah County Defendants*     ☒ e-Mail/CM/ECF


Heather White & Scott Young               ☐ Hand Delivery
10 Exchange Place, 11th Floor             ☐ U.S. Mail
Salt Lake City, UT 84111                  ☐ Overnight Mail
801.322.0400                              ☐ Facsimile
*Attorneys for Orem City Defendants*      ☒ e-Mail/CM/ECF

/s/ R. Shane Johnson